PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* MIGUEL MONTAÑEZ, Defendant and Appellant.

No. 7345. Argued March 10, 1939.—Decided May 22, 1939.

*Joaquín Velilla* for appellant. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the Court.

An information was filed by the District Attorney of Humacao against Miguel Montañez for murder committed on the night of December 28, 1935, in Yabucoa, where he illegally killed José B. Berríos, with malice aforethought, by assaulting him with a revolver and inflicting upon him such wounds with the shots that caused him to die that same night.

The case was finally heard before a jury that found the defendant guilty of voluntary manslaughter, and the court sentenced him on October 1, 1937, to four years in prison at hard labor.

Montañez appealed and the hearing was held on March 10th last, both attorneys being present.

The appellant assigns twelve errors. The first five relate to the impanelling of the jury, the sixth was allegedly committed when the court refused a continuance of the case, the seventh in not allowing the testimony of certain witness, the eighth because the judge examined some witnesses, the

ninth because the parties were not notified when a question concerning an ocular inspection was going to be considered, and the eleventh when the court refused to give to the jury certain instructions requested by the defense. By the tenth and twelfth assignments it is argued that the verdict is against the weight of the evidence and that should the defendant be guilty, the penalty imposed is excessive.

■■ The first two assignments of error are discussed by appellant together. The court is charged with having erred "in not having ordered the marshal to present the return in relation with the summoning of the jurors constituting the several panels" and "in denying defendant's challenge to the whole panel."

The argument appearing in appellant's brief is long and elaborate. In order to simplify it the best thing appears to be to allow the record to speak for itself in order to find out what happened. It follows:

"Defense: The defendant is represented by Mr. Pereyó and myself, and when the case was called, Your Honor, we were under the impression that Messrs. Francisco Mújica and Dueño, of Juncos, were in the panel.

"Judge: These gentlemen were excused.

"Defense: Mr. Vicente Nieves, from Las Piedras.

"Judge: Those absent were excused.

"Defense: Then in the first special panel Mr. Clerk should call Mr. Frank Matta.

"Judge: He was also excused.

"Defense: And was Mr. Inocencio Velázquez called in the second special panel?

"Judge: He was also excused.

"Defense: Nor Mr. Miguel Nieves.

"Judge: He is excused.

"Defense: Then, Your Honor, because juror Manuel Portela Cabezudo has been reported absent by the clerk, we would like to see the return of the marshal to fined out how the jurors were summoned.

"Judge: The marshal will so do but only as to juror Manuel Portela Cabezudo.

"Defense: We would like to make a motion to the effect that we should be shown the return of the regular panel, rather, the second special panel, inasmuch as all are present from the regular and the first special panels.

"Judge: The court holds that only Mr. Portela's return should be brought, as he is the only one absent.

"Defense: Then we take an exception because our right to raise any question as to the return is being limited.

"Marshal: I was informed by the chief of the Insular Police of Gurabo that Mr. Portela Cabezudo has moved to another town and does not know which one.

"Q. Has he been summoned?

"A. He has not been summoned.

"Defense: Then, Your Honor, we challenge the whole panel because one of the jurors has not been summoned as provided by law.

"Judge: Overruled.

"Defense: We take an exception."

In the first place the assignment goes farther than the facts. It covers all of the panels when it actually happened with but one. And in the second place it does not appear that the judge flatly refused to order the marshal to show the return. After the judge himself told the attorney for defendant the jurors that had been excused, when said attorney asked for the return of the panel of which Manuel Portela Cabezudo formed part, the judge said: "The court holds that only Mr. Portela Cabezudo's return should be brought, as he is the only one absent," and then came the marshal's testimony concerning the reason why he was not served.

All the argument turns around the fact that the provisions of the statute and the jurisprudence were not strictly complied with, and that the marshal used the police force without being authorized for it.

The applicable provisions are Sections 211 and 212 of the Code of Criminal Procedure, which provide:

"Section 211.—A challenge to the panel is an objection made to all the jurors returned, and may be taken by either party.

"Section 212.—A challenge to the panel can be founded only on a material departure from the forms prescribed in respect to the drawing and return of the jury or on the intentional omission to summon one or more of the jurors drawn."

We agree with appellant that the words "y formación de la lista de jurados" which appear in the Spanish text of Section 212 do correspond to the word "return" which appears in the English text, and which is the correct one.

The word "return" means the formal report made when a duty has been complied with (54 C. J. 740). So in respect with summoning jurors "having executed the process directed to him, it is the duty of the summoning officer to make his return, showing his proceedings thereunder, which return is authentic evidence as to the persons who have been summoney to appear, and, in the absence of any suggestion to the contrary, will be taken prima facie as true." 35 C.J. 278.

No challenge is made to the drawing of the jury. Emphasis is drawn upon the summoning, adding thereto the alleged refusal of the court to the presentation by the marshal of the return and that the police could not be resorted to to serve that order.

We have already seen what appears from the record as to the refusal of the court. It did allow the request as to the juror that was not summoned, which was the only thing then in issue, and the defendant did not insist upon it, nor did he show then nor does he show now that there were grounds to believe that the other jurors were not duly summoned, so that after such a discussion the only fact remaining is that juror Portela was not summoned because the Chief of Police of Gurabo said that he had moved to another town, and the marshal did not know to which one.

Does this constitute the material departure that the legislator had in mind when it was not alleged nor proved that the juror was not summoned intentionally? In our opinion, the answer must be in the negative, which answer becomes stronger in the light of the reasoning and conclusions of this

very Court in the case of *People* v. *López,* 49 P.R.R. _____.
In that case this Court held through Mr. Justice Wolf:

"The defendant next attacked the panel as formed. In essence, the attack, as we conceive it, was based upon the ground that a certain person, designed to be summoned as a talesman, was not actually summoned.

"The appellant indeed complained that the marshal had made no return of the actual citation of the talesmen. The record actually shows that the talesmen who made up the panel from which the jury was eventually drawn, were all duly summoned, with the one exception mentioned, and the failure to make a return, if error, was harmless.

"Coming then to the omission to summon a particular person, the jurisprudence is sufficiently clear that unless such omission was intentional a challenge to the panel should not prevail. This is perfectly consistent with our statute which reads as follows: (Section 212 already cited of the Code of Criminal Procedure.)

"Likewise we have held, and other courts have held, that the formation of a panel is very largely in the discretion of the trial court. *People* v. *Lanausse,* 30 P.R.R. 679; *People* v. *Vázquez,* 20 P.R.R. 338; *People* v. *Pillot,* 20 P.R.R. 353; *People* v. *Juliá,* 25 P.R.R. 238:

. . . . . . . . . .

"As usual when the case was called for trial there were jurymen ready to sit at a trial. In murder cases, however, the court is aware that the jurymen may not be sufficient and ordinarily takes steps to summon talesmen. Our statute provides that the summoning should be done by an officer of the court, but the marshal who usually acts is authorized to use agents for this purpose and even to use telegrams as was done in the case before us. *People* v. *Lanausse,* supra."

■■ The third and fourth assignments of error are also discussed together. Both refer to juror Ramón Rivera Alverio.

Rivera was called to act as juror in a previous trial of the same cause and he was challenged. The attorney for defendant asked him on what grounds had he been challenged

and the District Attorney objected. The court decided the question as follows:

"What the court thinks is that it is unnecessary; that nothing of what took place at the other trial in regard to the selection of the jury has any weight now, but what should be done presently is to examine the juror in regard to his present state so as to challenge him or not, as the parties may set fit to do."

The questioning of the juror went on by attorney for defendant, and was examined in regard with his state of mind to render a verdict. We transcribe the following:

"Q. Then, Mr. Rivera, are you in a state of mind to render an impartial and fair verdict, based strictly on the evidence offered in this case?

"A. Yes, sir.

"Q. So, Mr. Rivera, that your state of mind is such that if this defendant should prove his innocence you would acquit him without hesitation?

"A. If the evidence would justify it, I would acquit him.

"Q. So, Mr. Rivera, if this defendant should fail to prove his innocence, what would you verdict be?

"A. Guilty."

From the last answer the appellant concludes that the juror was not in a position to render an impartial verdict. The court did not think so for it deemed the question one of law which could not have been well understood by the juror.

We are inclined to believe that the court acted correctly on both occasions. It was unnecessary to investigate the grounds had for the challenge at the previous trial, especially considering the ample opportunity had by the attorney to examine the juror as to his state of mind when summoned to serve as such. And as to the answer of the juror, as it was given during a series of questions and answers tending to establish the impartiality of said juror, it can not be considered of such importance as the defense contends.

**818**

Furthermore, even had the court ruled erroneously, as the defendant did not peremptorily challenge the juror later, without having consumed the number of peremptory challenges granted by law, the error could not serve as basis for a reversal. *Pueblo* v. *Morales,* 45 P.R.R. 185, *People* v. *Vázquez,* 20 P.R.R. 338.

■ The fifth assignment of error is stated thus: "The lower court erred in unduly limiting the extent of the *voir dire* examination of juror Facundo Colón."

According to the record the following occurred:

"Defense: Q. If it may please the court, Colón, do you know the defendant?

"A. Yes, sir, I know him.

"Q. And did you know José Berríos?

"A. No, sir.

"Q. And did you know the facts of this case?

"A. From the newspapers.

"Q. Has that information led you to form an opinion in the case?

"A. No, sir.

"Q. Are you, then, in a state of mind to decide the case exclusively on the basis of the evidence offered here?

"A. Yes, sir.

"Q. Under those circumstances, if this defendant should prove to you his innocence, what would your verdict be?

"A. Not guilty.

"Q. And if he failed to prove to you that he is not innocent, what would be your verdict?

"District Attorney: Do not answer, we object to the question as it has been worded.

"Judge: The question is allowed; answer.

"Defense: Q. You stated that should be prove his innocence that your verdict would be 'not guilty'; now the question is, and if he fails to prove to you his innocence, what would be your verdict?

"A. It would be according to the evidence.

"Q. And if according to the evidence introduced by defendant he should fail to prove his innocence, what would your verdict be?

"District Attorney: The evidence does not appear.

"Judge: The court upholds the District Attorney and sustains the objection; the truth is that the question, as stated, should not

be asked to the juror for it involves a technical element of which he must be informed before he can answer.

"Defense: Then I can not continue my questions on that line?
"Judge: No, not that question."

The incident continues on the same line and takes up several pages of the record. It can be seen that the attorney for the defendant followed here the same technique as with juror Portela. Apparently, he tried to confuse the juror by introducing in the questions a question of law. As in the previous occasion, we think that if the court had allowed the juror to answer, after explaining him the situation clearly, there is no doubt that his answer would have been in line with the others given by him which tended to show that he was fit to act as a juror, and the incidents would have been done away with.

The court, however, decided to act in the manner stated, and we are inclined to think that it exercised its discretion correctly, or at least that no abuse thereof was committed. Its attitude was not a limitation upon defendant's right to examine the jurors. The record, speaking for itself, states how widely defendant exercised that right.

■ The sixth assignment charges the court with having erred in refusing to order a continuance of the trial because a witness did not appear.

We have examined the record and no abuse of discretion seems to have been committed by the court. The request was made after the impanelling of the jury, and if the defendant did not know that his own witness was sick, it was because he failed to exercise due diligence. Furthermore, the materiality of his testimony does not appear clearly, nor that it was beyond defendant's power to obtain another similar witness; but the record rather shows that the defendant could have obtained another witness, since what the defense wanted to prove through that witness, who could not appear because of illness and who was the Chief of Police of Yabucoa at the time the crime was committed, was that "that chief,

together with other officers of the law, heard shots being fired,'' and on that account ''he arrested another person, who was not the defendant, for carrying a weapon and using it in that place.'' And if that was so, and ''other'' or ''some other officers'' of the law were present, why not credit with their testimony the fact stated?

Therefore, the sixth error was not committed. Nor the seventh, which is stated thus: ''In permitting witness José María Ortiz to testify that the defendant was drunk when the crime was committed.''

José María Ortiz is a lawyer practicing in Yabucoa. On the night in question he was with some friends, among them the deceased Berríos, in the town's square. Upon being questioned he answered:

''A. After we had been in the square a short while the defendant came as from Cristobal Colón Street and he sat down on a small fence, a culvert, that faces the square and he began to use insulting and obscene language, and then Mr. Berríos called his attention to the fact that he should not speak thus because we were not bothering him; then he started to speak again using similar language.

. . . . . . . . . .

''A. The defendant got up and walked a little towards the street, the other street, that is to say Muñoz Rivera Street, and then, at that place, he pulled out his revolver,, and as he did so, we, who were sitting in the square, ran immediately towards them who were standing up, . . .

. . . . . . . . . .

''Q. Go on. What else happened?
''A. Then, I think it was Mr. Berríos but I can not remember exactly, was told, what you should do is go to bed, because the man was. . .
''Defense: Don't say it.
''District Attorney: Q. Of course, state how he was.
''A. The truth is he was drunk.
''Defense: I move to have it stricken.
''Judge: Overruled, as an inference of the witness.

. . . . . . . . . .

."Defense: In order to speak of the state of a person should be qualified as an expert physician; an ordinary witness can testify only as to outward manifestations of a given state.

"Judge: The court maintains that any person of average intelligence is qualified to testify as to the aspect of any person who is drunk.

"Defense: I admit that he can testify as to the aspect but not as to the state, which are two different things.

"Judge: As to the state of inebriation of any person.

"Defense: We take an exception.

"Judge: Now in the cross-examination you may bring forth any details to show that the inference of the witness is erroneous. You may continue, District Attorney."

The ruling of the court is supported by the jurisprudence. In the case of *People* v. *Gerardino,* 37 P.R.R. 173, 184, this court said through Mr. Justice Franco Soto:

"In the days of Hipocrates pulmonary tuberculosis was being studied and it was described in his work. Its spread in the human race has been such for want of specific remedies that the physical symptoms of the disease are familiar to laymen.. This does not indicate that the knowledge based on experience is an expert guide for the trial judge, but it is a circumstance to be considered by the court in connection with the other elements of proof."

And in the text Underhill, on Criminal Evidence, Section 231, p. 432, reads as follows:

". . . Thus, also, a nonexpert may testify whether one was drunk or sober, or under the influence of intoxicating liquor, in his opinion, or that the other appeared to be drunk or drinking, and the witness as a rule should give the fact on which he bases his opinion, though it is not always necessary."

By the eighth assignment, the court is charged with having erred "in unduly taking part in the examination of witnesses."

After studying the transcript of the evidence we think that what the prosecuting attorney states in his brief is a sufficient answer, to wit:

"This supposed error is also frivolous. In the first place, the defense never called the court's attention to the fact, nor objected

822

to its conduct; and in the second place, because the conduct of the judge throughout the trial, and his limited part in the examination of witnesses, at no time revealed to the jury that his mind was prejudiced towards either side. *People* v. *Gutiérrez*, 44 P.R.R. 27; *People* v. *Villanueva*, 49 P.R.R.——; *People* v. *Cruz*, 46 P.R.R.——; *People* v. *Millán*, 46 P.R.R. 889; *People* v. *Saltari*, 53 P.R.R.——."

The ninth error is nonexistent. It is argued under the assignment that the court erred "because it did not summon the parties when it was going to decide a petition for an occular inspection made by the jury, nor in denying the same."

According to the record, the following occurred:

"Foreman of the Jury: Your Honor, the jury has decided to request the court to allow us to go to Yabucoa to see the place where the crime was committed.

"Judge: Q. Can the foreman inform the court as to whether the jury has talked over the absolute necessity to do so?

"A. A majority of us so decided.

"Q. A. . .

"A. Majority.

"Judge: The gist is that a reconsideration of the question might result in that the trip would not be absolutely necessary. Of course, if after such a reconsideration the trip should be considered absolutely necessary, the Court would agree to it. The Court desires to offer this new opportunity because at all events, even though the court desires to put the jury in the best position to discharge its duties as it best may, if in every case an occular inspection had to be effected, its cost and the time spent therefor would rather constitute an impediment than and aid to justice. However, your opinion is what counts, and if you think it indispensable, you will please tell the court and your petition will be reconsidered.

"The jury again retired to deliberate."

It does not appear from the record that the attorney for the defendant was absent nor that he took an exception to the ruling of the court. It did not flatly refuse to grant the request. It left the matter to the consideration of the jury and the jury did not insist upon it. The court had discretion to thus act. There was no error.

 Nor was the eleventh error committed. The defendant, through his attorney, filed with the court long and repeated instructions—twelve in number—all concerning reasonable doubt, and prayed that the same be given to the jury. The court then went on to give its own instructions that thoroughly cover the matter. When the court finished, the attorney for the defendant said: ''The defense would like to know what the court has ruled as to requested instructions,'' and the judge answered: ''The provision of the law has been complied with, substantially included in those given,'' and the defense took an exception.

Since the matter was duly covered, as we have already stated, that is, since the judge himself correctly instructed the jury as to reasonable doubt, he was under no obligation to give to the jury the instructions prepared by the defense regardless of their correction, as this court has repeatedly held.

 By the tenth assignment it is argued that the verdict is against the weight of the evidence.

We are conversant with the testimony of eye witness for the prosecution Ortiz. Another of the witnesses for the People, Rogelio Rodríguez, a business clerk, testified.

''After the end of the dance, Berríos, Paco Díaz and myself left and walked up Luis Muñoz Rivera sheet, towards the square . . . we met there some friends who were sitting on a rampart of the square that is on that same corner . . . we began to speak and said that the dance had ended too soon. . . Miguel Montañez . . . sat on the culvert just across from where we were . . . we had changed the topic of conversation and spoke of politics, then Montañez got up . . . irately . . . and began to speak obscenely of the Socialist party and the Coalition. . . When he was thus speaking, Berríos told him that we spoke in friendly terms of our own matters, and he should not interrupt us since we had not addressed him; that he had no reason to take offense; but in spite of it Montañez continued acting as if he were offended and then Berríos asked him whether he wanted any trouble with him or those present. Immediately Montañez said he was ready for anything and pulled out his gun and

invited Berríos to do the same thing, and Berríos was telling he did not need a gun to lick him; that if he had to fight his arms were enough. Then, the group of us, realized how serious a turn the incident had taken and we tried to interfere and persuade Montañez of what he was about to do, but he would not desist and continued defying Berríos, . . . and he walked forward with the gun in his hand and Berríos behind, and on the right-hand sidewalk Mr. Miguel was walking with us, the group of persons was walking behind, and when he were in front of the theatre, Montañez fired the first shot at Berríos, and then I told Berríos he should defend himself, that he was in great danger, in spite of the fact that Montañez' first shot had not hit him, but Berríos took no heed of my warning, and then Montañez fired again and hit Berríos and he began to fall towards hir right side and fell on the every foot of the street behind the electric pole that is in the corner. Immediately Montañez fired another shot at him, and Berríos then, from the ground, tried to pull out his gun, and with superhuman strength tried to get up and fired at Montañez who was hiding behind the lamp post located between himself and Berríos. Then Montañez kept firing again and hiding each time behind the pole, and Berríos also fired.''

And Dr. Miguel Veve, a surgeon and physician, stated:

''On December 29, 1935, in Yabucoa, when I arrived to the emergency ward, he (Berríos) was already dead. . . I felt his pulse because they told me he was alive, but the heart had stopped beating, there was no pulse. I immediately had his clothes taken off and I found a bullet wound, the orifice left by the bullet upon entering and leaving on the left arm. . . I found a bullet on the edge of the armpit, on the rear part of the axila. . . That one had no exit orifice. . . A bullet wound in the lumbar section with no exit orifice .. . . that was the cause of his death. . . The bullet wound with a large hemorrhage, and of course, almost a sudden death, the heart was perforated, and the wound in the kidney, a large hemorrhage, there would have been time to do something but it was also mortal.''

Upon being asked about the condition of the defendant, he answered:

''I went to headquarters at the request of the district attorney to examine Montañez, the defendant, who had bruises on the upper or lower side . . . but he objected to my assistance and preferred Dr. Cintrón, and sent for him. . .''

What has been transcribed will suffice to give a picture of the evidence for the prosecution. In order also to have one of that of the defense, it will be sufficient to transcribe the pertinent testimony of Virgilio Medina, of Dr. Julio Cintrón and of the defendant himself.

Medina testified:

"The first shots came from the group of persons where Berríos and Montañez were, and Miguel Montañez ran from the group . . . as soon as Montañez hid behind the pole, then we heard the shot and saw the fire from the shots fired from behind the pole, but then we heard other shots but I do not know where they came from because I saw nothing else."

Dr. Cintrón stated:

"At the request of the district attorney I cured Montañez. I went to headquarters but I told the district attorney that I could not cure him there, that he had to·be taken to the hospital. . . Once we arrived at the hospital I tried to locate the wound, but it was extremely difficult because every movement of Montañez did away with the light . . . after a difficult and long while I found a bullet wound in the upper lip. I maintain it is a bullet wound because, if it weren't a bullet wound, that is to say, if there were a hole, I would have been unable to introduce the stiletto, and that stiletto supports the contention that there was a hole that supported the stiletto."

And the defendant testified:

". . . that night I left the dance given by the liberals at the house where Dr. Roure Macías, a dentist, lived . . . and upon passing . . . before the plaza, a little before I arrived there, I heard a citizen who was in a group of persons, they were Román, Pepe Berríos and Luis Cordero, and Ortiz, Miguel Angel. . . He was saying that the liberals were all scoundrels, and other obscene words, then, instead of passing by the front, I passed at angle made by the plaza, I crossed the square towards the front of police headquarters and there, on this side, I found Virgilio Medina sitting down and also Agustín, I went down to Carmelo Martínez and purchased a cigar. . . In order to go home to bed, when I arrived in front of the group of persons, one of them said, there goes again that scoundrel, and Pepe Berríos left the group and came towards me and said: 'Why haven't you gone to bed;' then he grabbed me here, by the arms, while I

talked to him and asked him what they were going to do to me, that I was alone; because I saw his attitude towards me. Then somebody hit me from the back and I turned around to defend myself; then they all came at me, and I kept backing up hitting those I could reach and suddently I started running, and when I reached the corner of San Rafael street I heard those coming behind me say: 'Let us finish, let's kill that dog, let's break his leg;' then I turned around and I heard two shots and I felt one hit me on the face, then I got behind the pole, when I got behind the pole, I had a black revolver with me, 38 caliber, of course, I had to tear my shirt, and I fired three shots at the group, when I fired the three shots they hit me with something from behind. I fell forward and the revolver dropped from my hand. When I found myself unarmed I started running and they still fired from behind. I heard shots until I arrived home, and there the policeman picked me up. . . Andrés, I can't remember his last name . . . from there they took me to headquarters all full of blood, then officer Estrada took some cotton and made a compress because there was too much blood. I took a large package of cotton and pressed it there to stop the blood. About to or three hours later Dr. Cintrón arrived and examined me. I can say nothing of that because I was like dead and I felt nothing. I did not even feel anything when they cured me and came to myself on the road.I did not feel in spite of the injections they put on me.''

After examining that evidence one can not fail to conclude that the jury had ample evidence to, after deciding the conflict, render the verdict of guilty it did. There was no error.

■■■ The last assignment is worded thus:

''That should the defendant be guilty of the crime charged, the penalty is excessive.''

According to the record, on October 1, 1937, the day set for sentencing the defendant, he appeared with his attorney. When the judge asked if there was any reason why sentence should not be imposed, the attorney stated that he wanted to offer certain evidence. He did present witness Ernesto Carrasquillo who testified that he resided at Yabucoa, that he was a representative to the Legislative Assembly for the district of Humacao–Yabucoa, that he had known the defendant for twenty years, and referring to him said that he had

a good reputation, that he was married and had three children, that he had never been convicted of a felony, and that he was a model citizen.

The attorney then stated that should the defendant testify he would say that he was married and had three children, and asked "the court to bear in mind when sentencing the accused that he has a family, that he is a working man and has always been one, and that he has an excellent reputation in the community, and prays for leniency in the imposition of the penalty."

Then the judge spoke as follows:

"The defendant will raise. In passing sentence in this case, the Court bears in mind its impressions of what occured on the night in question. That impression is that if it is true that you killed the deceased by firing at him on December 28, 1935, you were led into the fight that resulted in the death of said person. So that you were not the person who voluntarily began the fight, and this should not be taken as a criticism of the jury's verdict, that is according to law. It is clear that there are weighty circumstances so that the penalty will not be the one this Court habitually imposes in those cases where the person convicted is the one who provokes the fight, or is so guilty in his interference as the other party to the fight. The sentence is four years in prison."

Since this is the case, we do not think the defendant can complain. The judge could have sentenced him to ten years. He sentenced him to four. We see no abuse of discretion. There was no error.

By virtue thereof, since none of the errors assigned have been committed, the judgment appealed from is affirmed.